IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| WYATT J. K. KAM,<br><br>  Plaintiff,<br><br>  v.<br><br>CARLTON HELM; ROBERT FARRELL;<br>and DOE DEFENDANTS 1-10,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civ. No. 19-00052 ACK-KJM<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING IN PART AND DENYING IN PART THE OFFICER DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This case arises from a July 4, 2017 incident in which Department of Land and Natural Resources, Division of Conservation and Resource Enforcement ("DOCARE") officers Robert Farrell ("Chief Farrell") and Carlton Helm ("Officer Helm"; and, collectively with Defendant Farrell, the "Officer Defendants") boarded a boat and piloted it and its passengers back to shore during the Flotilla event off-shore of Waikiki Beach. Plaintiff Wyatt Kam ("Kam") alleges that the Officer Defendants used excessive force to conduct an unreasonable search and seizure and brings claims for constitutional and civil rights violations, as well as several state law claims.

The Officer Defendants have moved for summary judgment on most of Kam's claims against them, arguing that they are entitled to judgment as a matter of law and no genuine issues of

material fact remain.  See ECF No. 52 ("Motion"). For the
reasons to be discussed below, the Court GRANTS IN PART AND
DENIES IN PART the Officer Defendants' Motion for Partial
Summary Judgment.

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are
undisputed.  They are principally drawn from parties' concise
statements of facts ("CSFs") and the evidentiary exhibits
attached thereto.[1]

### I.    The Flotilla Event on July 4, 2017

On July 4, 2017, the Wind Warrior, a 47-foot
catamaran, was at the Flotilla event, an annual Fourth of July
celebration held off-shore of Waikiki Beach.  Defs'. CSF, ECF
No. 53, ¶¶ 1-4; Pl's. CSF, ECF No. 75, ¶¶ 2, 4, 10.  The
Flotilla event brings over a thousand people and hundreds of
boats and personal floatation devices like plastic pool
floaties, kayaks, and surfboards, to the waters off Waikiki
Beach.  Pl's. CSF ¶¶ 6-7; Defs'. CSF ¶¶ 4-6.  Individuals

---

[1] Pursuant to LR 56.1(e), when the party opposing a motion for summary
judgment submits additional facts in a separate section of its concise
statement (as Kam did here), "the movant shall file, together with its reply
brief, a further concise statement that responds only to those additional
facts."  The Officer Defendants, as the moving parties, did not submit any
further concise statement with their reply.  Unless clearly disputed by the
Officer Defendants' initial concise statement, therefore, the Court assumes
the facts asserted in Kam's separate concise statement are undisputed.
Because the facts on which the parties disagree are relatively obvious, this
does not impact the Court's analysis.

congregate on the vessels near the Macfarlane Regatta, celebrating the Fourth of July by eating, drinking, and enjoying the water. Defs'. CSF ¶¶ 4-7, Pl's. CSF ¶¶ 4-8. Attendees often consume a considerable amount of alcohol. Defs'. CSF ¶ 7.

Kam has attended the Flotilla event on the Wind Warrior in years past. Pl's. CSF ¶ 9. In prior years, Kam has remained on the Wind Warrior anchored off-shore of Waikiki Beach overnight, returning to shore the following morning. Pl's. CSF ¶ 9.

On July 4, 2017, Kam rode on a different boat, the Sea Dog II, to the Flotilla event. Defs'. CSF ¶ 10-11; Pl's. CSF ¶ 10-11. Upon arrival, the Sea Dog II was tied to the Wind Warrior. Defs'. CSF ¶ 11; Pl's. CSF ¶ 11. The individual who piloted the Wind Warrior to Waikiki had an understanding with Kam and a third individual, Mr. Buckman, that one of them would keep an eye on the Wind Warrior if the others were gone. Pl's. CSF ¶ 13.

While at the event, Kam spent time on both boats, as well as swimming in the water. Defs'. CSF ¶ 13; Pl's. CSF ¶ 12. Kam consumed alcohol and became intoxicated, as did many other individuals attending the event. Defs'. CSF ¶¶ 7, 29, 31.

At some point, there was an altercation in which two men boarded the Wind Warrior and became confrontational. Pl's. CSF ¶ 17; Defs'. CSF ¶¶ 15-17. The altercation ended when Kam

and Mr. Buckman pushed the two men off the boat.  Pl's. CSF ¶ 17; Defs'. CSF ¶ 18.  DOCARE officers responded to the altercation shortly thereafter.  Pl's. CSF ¶ 18; Defs CSF ¶ 19.

## II.  Encounter Between Plaintiff and DOCARE Officers

On the day of the 2017 Flotilla event, Chief Farrell and Officer Helm were employed and on duty as DOCARE officers. Defs'. CSF ¶ 20.  Part of their duties included responding to near drownings, missing persons, medical emergencies, alcohol violations, fights, and disorderly conduct.  Defs'. CSF ¶ 21. The Officer Defendants approached the Wind Warrior in response to a report of a fight and several officers—including Officer Helm—boarded the boat and asked those on board where the captain was.  Pl's. CSF ¶¶ 18-19; Defs'. CSF ¶ 24.  Kam responded that he was in charge.  Defs'. CSF ¶ 29; Pl's. CSF ¶ 20.  Kam was intoxicated and could not produce any identification, boating license, or documentation showing that he could safely operate the Wind Warrior.  Defs'. CSF ¶¶ 29-30.

The parties dispute the specifics of what happened next.

### a. Kam's Version of the Interactions with the Officers

According to Kam, Officer Helm boarded the Wind Warrior without announcement of his authority or permission to do so.  Compl. ¶ 18.  Officer Helm asserted that everyone aboard

was under arrest and that the vessel would be impounded. Compl. ¶ 22. Officer Helm demanded to know who the captain was and became aggressive in response to Kam's statement that he was in charge. Pl's. CSF ¶ 20; Compl. ¶¶ 23-27. He yelled at Kam to "shut the fuck up" and lie face down on the deck, prompting the concern of another DOCARE officer who stepped between Officer Helm and Kam. Pl's. CSF ¶ 21. Kam laid down on the deck of the boat as instructed. Pl's. CSF ¶ 22. Officer Helm ordered other officers to search the Wind Warrior and he began searching through the cabinets himself, breaking several cabinets in the process. Pl's. CSF ¶ 23. Kam does not address—and so does not contest—that this search was performed to locate life jackets. Kam does allege that he offered to assist "locat[ing] anything the officers may be searching for," but Officer Helm told him to stay prone on the deck and stepped on Kam's back for several minutes. Compl. ¶ 37; Pl's. CSF ¶ 24.

Kam states that Chief Farrell was adjacent to the Wind Warrior on the DOCARE boat with a clear view of the entire incident, and that Chief Farrell ultimately ordered that Officer Helm drive the Wind Warrior back to the Ala Wai Harbor with all passengers on board. Pl's. CSF ¶¶ 25-27. Officer Helm cut the anchor line to the Wind Warrior and piloted the boat back to the

harbor.[2/]  Pl's. CSF ¶ 28.  Chief Farrell remained in the DOCARE vessel adjacent to the Wind Warrior and communicated with Officer Helm both by speaking aloud and by speaking over the radio.  Pl's. CSF ¶ 30.

According to Kam, he was forced to remain prone on the deck from Officer Helm's initial instruction through the duration of the trip back to Ala Wai Harbor, for a total of approximately one hour.  Pl's. CSF ¶¶ 22, 29.  During the drive back, Kam requested to use the restroom and Officer Helm told him "shut up or I'm going to smash your head in," again stepping on Kam's back such that he could not move.  Pl's. CSF ¶ 29.

After returning to Ala Wai Harbor, Kam was told that he was free to leave.  Pl's. CSF ¶ 32.  According to Kam, other officers present expressed some confusion or concern about the justification for the events, noting an apparent lack of probable cause for seizing the Wind Warrior, a lack of clarity about what they were investigating, and discomfort with the nature of Officer Helm's conduct towards Kam.  Pl's. CSF ¶¶ 31-36.

---

[2/] Kam's Complaint contradicts itself on this point, in one place stating that Defendant Helm ordered the anchor line cut, and in another place stating that officers manually raised the anchor.  Compare Compl. ¶ 40 with Compl. ¶ 42.  In his Opposition to the Motion, Kam asserts the anchor was cut, and supports this with testimony from Officer Colt.  Kam Decl. ¶ 22; Pl's. Ex. B at 16:23-25.  Kam's counsel represented at the hearing on this Motion that, despite the inconsistency in the Complaint, Kam asserts the anchor line was cut.

### b. The Officer Defendants' Version of the Interactions with Kam

The account of events offered by the Officer Defendants varies considerably. According to them, when responding to the fight aboard the Wind Warrior, Officer Helm became concerned about the vessel being overloaded. Defs'. CSF ¶ 23. Officer Helm maintains that, once on the Wind Warrior, he saw a man who had just hit the boat as he was falling off of it, a woman who appeared unconscious, and a number of intoxicated people who appeared to be under the age of 21. Defs'. CSF ¶¶ 25-27. The Officer Defendants found a significant risk of dehydration and hypothermia and found the boat insufficiently equipped to navigate at night in the crowded environment of the Flotilla event. Defs'. CSF ¶¶ 32-34. They also did not believe the occupants were in any condition to swim back to shore if necessary. Defs'. CSF ¶¶ 32-34.

Because of these circumstances, the Officer Defendants determined that the Wind Warrior needed to be returned to shore. The Officer Defendants contacted the Coast Guard for assistance, but the Coast Guard was unable to assist. Defs'. CSF ¶¶ 36-37. Officer Helm instructed the other officers present to locate life jackets, and they proceeded with the passengers on board to drive the boat back to shore. Defs'. CSF ¶ 38. According to the Officer Defendants, Chief Farrell never boarded the Wind

Warrior, was never within arm's reach of Kam, and never saw, heard, or was aware of Officer Helm using any force whatsoever on Kam. Defs'. CSF ¶ 41.

## **PROCEDURAL BACKGROUND**

On January 28, 2019, Kam filed a Complaint asserting claims against Officer Helm and Chief Farrell. ECF No. 1. Kam brings claims of excessive force and unreasonable search and seizure in violation of the Fourth Amendment, and state law claims of assault, battery, false arrest and false imprisonment, invasion of privacy, intentional infliction of emotional distress, and negligence. ECF No. 1.

On December 4, 2019, the Officer Defendants filed a motion for partial summary judgment. ECF No. 52. Officer Helm argues that he is entitled to summary judgment on the claims for unreasonable search and seizure, false arrest and false imprisonment, and intentional infliction of emotional distress. Mot. at 2. Chief Farrell argues that he is entitled to summary judgment on all the claims except negligence. Mot. at 2. Kam filed his Opposition on February 11, 2020, ECF No. 74, and the Officer Defendants filed their Reply on February 18, 2020, ECF No. 76. The Court held a hearing on Tuesday, March 3, 2020.

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure ("Rule") 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see also</u> <u>Broussard v. Univ. of Cal.</u>, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007) (citing <u>Celotex</u>, 477 U.S. at 323); <u>see also</u> <u>Jespersen v. Harrah's Operating Co.</u>, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586–87 (1986) (citation and internal

quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

### I. Standing

Although neither party raises the issue, the Court begins by addressing standing. Kam's Complaint asserts an unreasonable search of the Wind Warrior and an unreasonable seizure of his person. Compl. ¶ 69. The Complaint is vague as

to whether Kam also intends to assert an unreasonable seizure of the Wind Warrior, but Kam's Opposition makes that point.  See Compl. ¶ 68-73; Opp. at 9-12.

The Wind Warrior is not Kam's boat.  His standing to assert an unreasonable search and seizure thereof is thus contingent on whether he had "sufficient possessory rights." Lyall v. City of Los Angeles, 807 F.3d 1178, 1186 (9th Cir. 2015).  "To be shielded by the Fourth Amendment, a person needs 'some joint control and supervision of the place searched,' not merely permission to be there."  Id. at 1186–87 (quoting United States v. Lockett, 919 F.2d 585, 588 (9th Cir. 1990)).  A person's right to exclude others from a location suggests there is Fourth Amendment standing.  Id.; see also Byrd v. United States, 138 S. Ct. 1518, 1527, 200 L. Ed. 2d 805 (2018) ("[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." (quoting Rakas v. Illinois, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, 430, 58 L. Ed. 2d 387 (1978))).

Courts have considered the requisite possessory interest in the context of borrowed vehicles.  In United States v. Portillo, 633 F.2d 1313 (9th Cir. 1980), the court held that an individual who borrowed a friend's car had standing to challenge a search of the car because the individual (1) had received permission to borrow the car; and (2) had the keys to

the ignition and trunk, "with which he could exclude all others, save his friend, the owner." Id. at 1317. This was distinct from the position of a mere passenger, who would not have standing. Id. In United States v. Thomas, 447 F.3d 1191 (9th Cir. 2006), the court applied the same logic to hold that a driver of a rental car who was not authorized under the lease agreement to control or possess the vehicle nevertheless had standing to challenge a search "to the same extent as the authorized renter" if he received permission to use the rental car and had joint authority over it. Id. at 1197-99. "This approach is in accord with precedent holding that indicia of ownership-including the right to exclude others-coupled with possession and the permission of the rightful owner, are sufficient grounds upon which to find standing." Id. at 1199 (citations omitted); see also Byrd, 138 S. Ct. at 1531 (holding that "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat" Fourth Amendment standing).

Here, the facts could support Kam having a sufficient possessory interest for standing to challenge the search and seizure of the boat. He asserts that he had an understanding with the lawful possessor that he was partially "in charge" of the Wind Warrior. Pl's. CSF ¶ 13. And he told the officers that he was in charge when they arrived. Pl's. CSF ¶ 20. Kam's

claim of lawful possession is bolstered by his assertion that he commonly utilized the Wind Warrior for recreation as both a crewmember and captain.  Pl's. CSF ¶ 2.  Finally, Kam asserts that he and Mr. Buckman forced two confrontational males off the Wind Warrior, suggesting some right to exclude others.  Pl's. CSF ¶ 17.

On the other hand, it is not obvious that Kam had possessory rights of the Wind Warrior; he may better be characterized as a mere passenger.  Kam did not drive the Wind Warrior to the event; there is no indication that Kam had the keys; and the vessel was anchored in place potentially for the night.  The exclusion of others was also undertaken alongside Mr. Buckman, who arguably also had a possessory interest in the vessel.[3/]  These facts could undermine Kam's Fourth Amendment standing to challenge the search or seizure of the Wind Warrior.

"Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before

---

[3/] It is not clear who the owner of the Wind Warrior is.  Kam asserts that Mr. Buckman paid Kam to perform repairs on the vessel and that a friend of Mr. Buckman's son drove the Wind Warrior to the Flotilla event.  Pl's. CSF ¶ 3; Pl's. Ex. A at 39:10-21.  Kam also describes the vessel as "Gino Morelli's first baby" in his deposition.  Defs'. Ex. A at 25:5-7.  Officer Silberstein testified that another officer contacted Beverly Little at the Hawai`i Kai marina who informed the officer that the Wind Warrior was registered to someone named Hittenhouse, Pl's. Ex. C at 16:17-25.  The Complaint references Officer Helm demanding to know who the captain was and asking for two individuals by name, neither of whom were present, Compl. ¶ 25.

addressing other aspects of the merits of a Fourth Amendment claim." Byrd, 138 S. Ct. at 1530.  The Court does not reach a determination on the issue of standing to challenge the search or seizure of the Wind Warrior at this time, but the Court notes that the parties will eventually need to confront this issue.

## II.  **Chief Farrell's Liability for Excessive Force**

The parties do not dispute that Chief Farrell remained on the DOCARE vessel for the duration of the encounter on July 4, 2017—Chief Farrell never boarded the Wind Warrior. Pl's. CSF ¶¶ 25, 30.  Chief Farrell argues that because Kam has not alleged that he personally participated in the use of force, the claim against him must be dismissed.  Mot. at 9.  Kam asserts that despite Chief Farrell's lack of personal participation, he has supervisory liability for Officer Helm's use of excessive force.  Opp. at 7-9.  The Court finds that Chief Farrell did not have the requisite participation in the alleged use of force and dismisses the claim against him.

Supervisors are subject to liability under § 1983 "when culpable action, or inaction, is directly attributed to them."  Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (Supervisory liability requires that "the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.").  Although a

- 14 -

supervisor need not be physically present for the injury, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009); Starr, 652 F.3d at 1205. A plaintiff can make this showing by pointing to (1) action or inaction in training, supervision, or control; (2) acquiescence in the complained-of constitutional deprivations; or (3) a reckless indifference to the rights of others. Starr, 652 F.3d at 1205-06 (citing Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991)).

### a. Events on July 4, 2017

Kam argues that because Chief Farrell "failed to control" Officer Helm and "failed to intervene" in the use of force against Kam, he has supervisory liability. Opp. at 8. But Kam has not provided any evidence that Chief Farrell was aware of and then failed to prevent Officer Helm's use of force on July 4, 2017. The only evidence Kam cites is the DOCARE internal affairs investigation interview of Chief Farrell, wherein Chief Farrell states that he had a "clear view" of Officer Helm's actions and that he did not see the officer threatening Kam:

> After the initial boarding of Officer Helm and when the crowd began to disperse, I had a clear view of all of Helm's actions, I had a clear view

of Mr. Kam, and at no time did I see Carlton
[Helm] place his boot or make any threatening
gestures towards Mr. Kam.

Pl's. Ex. D at 8:45-9:08.

Kam argues that Chief Farrell's statement that he had
a "clear view" of Officer Helm creates a factual issue that must
be decided by a jury. This argument ignores the substance of
the evidence presented: Chief Farrell did not see any use of
force occur. Moreover, in his interview, Chief Farrell stated
that as the DOCARE vessel approached the Wind Warrior, there
were 40-50 people on board, that there was a large commotion
with some people jumping off the Wind Warrior in order to avoid
the DOCARE officers, and that as Officer Helm boarded the
vessel, Chief Farrell could not see much because of the large
crowd. Pl's. Ex. D.

The only evidence before the Court regarding Chief
Farrell's involvement in the use of force on July 4, 2017 is
(1) the statement by Chief Farrell in the interview that he did
not see any use of force occur, Pl's. Ex. D; and (2) the
declaration submitted by Chief Farrell indicating the same,
Defs'. Ex. B and ECF No. 56 at ¶¶ 8-9 ("I did not see or hear
any DOCARE Officers, including Carlton Helm, use any physical
force on Wyatt Kam"; "I was not aware of any DOCARE Officers
using any physical force on Wyatt Kam"; and "I had no reason to
believe that any DOCARE Officers would use excessive force on

Wyatt Kam."). This fails to create a genuine issue of material fact regarding Chief Farrell's personal participation in Officer Helm's excessive use of force.

### b. Subsequent Ratification

Case law in the Ninth Circuit permits liability against a supervising officer if the supervising officer condones or ratifies the excessive use of force.

As an initial matter, there remains a dispute of material fact regarding whether the manner in which Officer Helm allegedly stepped on Kam's back while Kam was prone on the deck would constitute "excessive force" at all. Even assuming Kam could show that it did, the Court would still find insufficient facts to support a claim for subsequent ratification by Chief Farrell.

In Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991), the court upheld a jury verdict that a supervising officer was individually liable when he personally dismissed the plaintiff's excessive force complaint against the subordinate officers, and where expert witness testimony indicated that the supervising officer should have disciplined the subordinate officers and established new procedures to avoid future incidents. Id. at 646.

In Watkins v. City of Oakland, Cal., 145 F.3d 1087 (9th Cir. 1998), the court found a chief officer could be liable

for ratifying the excessive use of force by a subordinate officer whose police dog injured the plaintiff.  Id. at 1093-94. The chief officer had personally dismissed the plaintiff's complaint against subordinate Officer Chew "despite evidence of Officer Chew's use of excessive force contained in the report and evidence of Officer Chew's involvement in other police dog bite incidents . . . ."  Id. at 1093.  Likewise, the officer had dismissed the complaint "apparently without ascertaining whether the circumstances of those cases required some ameliorative action to avoid or reduce serious injuries to individuals from dogs biting them."  Id.  The chief officer also failed to establish new procedures despite evidence of numerous injuries to suspects apprehended by the use of police dogs.  Id. at 1093.

     The court reached the same result in Blankenhorn v. City of Orange, 485 F.3d 463 (9th Cir. 2007).  Even though the chief officer in that case did not personally dismiss complaints against the subordinate officer, he had previously approved the officer's personnel evaluations despite three prior complaints of excessive force.  Id. at 485-86.  The plaintiff offered expert testimony that the discipline the subordinate officer received for those three complaints was markedly insufficient—in fact, the expert stated that the subordinate officer should have been fired for the second complaint.  Id.  The court held that this evidence "could lead a rational factfinder to conclude that

[the chief officer] knowingly condoned and ratified actions by [the subordinate officer] that he reasonably should have known would cause constitutional injuries like the ones Blankenhorn may have suffered." Id. at 486.

Each of the Ninth Circuit cases finding a basis for supervisory liability on a theory of ratification relied on more evidence than Kam offers here. Both Blankenhorn and Larez included expert testimony regarding the deficiencies in the chief officers' actions. Blankenhorn, 485 F.3d at 486; Larez, 946 F.2d at 646. And in both Blankenhorn and Watkins, the chief officer was aware of the subordinate's history regarding the use of excessive force.[4/]

The evidence before the Court here does not rise to the level relied on in those cases. Kam submits some evidence supporting the contention that Chief Farrell received complaints about Officer Helm's use of force on Kam on July 4, 2017.[5/] Kam declares that he met with officer John Silberstein around March 2018, and Mr. Silberstein informed Kam that he and other officers "wrote a report detailing their concerns with Officer

---

[4/] In Blankenhorn, the chief officer had personally approved the subordinate's personnel evaluation despite three prior complaints. 485 F.3d at 486. In Watkins, the subordinate was involved in other incidents involving the specific kind of excessive force at issue (police dog bites), and there was evidence of numerous injuries to suspects apprehended by the use of police dogs without any subsequent establishment of new procedures in relation to their use. Watkins, 145 F.3d at 1093.

[5/] Kam provides additional evidence regarding complaints with relation to unreasonable seizure of the Wind Warrior, which is discussed infra.

Helm's use of force on July 4, 2017, and that Chief Robert Farrell threw his report in the trash and said he would fire [Silberstein] if he could." Kam Decl. ¶ 31. The Court notes that Kam submits a deposition of Officer Silberstein which contains no such allegation. See Pl's. Ex. C.

Kam also submits a deposition of Officer Colt who was present on the Wind Warrior on July 4, 2017. Pl's. Ex. B. Officer Colt describes Officer Helm and Kam standing one to two feet apart, Officer Helm saying "something to the effect of shut the fuck up," both Officer Helm and Kam "posturing," and Officer Colt reacting by placing his body in between the two men. Pl's. Ex. B at 13:19-14:10. Officer Colt also states that he voiced concerns to Chief Farrell about that incident and received a dismissive response. Pl's. Ex. B. at 22:2-17. The Court notes that Officer Colt provided no description of any physical contact.[6/]

Even viewing the evidence in the light most favorable to Kam and therefore assuming that Chief Farrell received two

_____

[6/] In addition to Officer Colt's description of the interaction reviewed above—containing no reference to Officer Helm physically touching Kam—Officer Colt's deposition includes the following exchange:
>     Q. Did you ever see Lieutenant Helm touch Wyatt Kam with
>     his feet or step over him in any manner?
>     A. No, I did.
>     Q. Did you ever say anything to Guy Chang or anybody about
>     concerns you had about Lieutenant Helm physically touching
>     Mr. Kam?
>     A. No, I did not.
Pl's. Ex. B, ECF 75-3, 24:8-14. While the phrase "No, I did" appears to be a typographical error, neither party references it. Accordingly, the Court does not rely on this exchange.

complaints about Officer Helm's interaction with Kam (at least one of which does not reference any physical contact), no rational factfinder could conclude that Chief Farrell knowingly condoned or ratified actions by Officer Helm that he reasonably should have known would cause constitutional injuries like the ones Kam alleges.  See Blankenhorn, 485 F.3d at 486.  There is no evidence that Chief Farrell was personally involved in the excessive use of force at issue or that Chief Farrell had prior or subsequent knowledge of other incidents involving Officer Helm.  Nor is there any expert testimony regarding the deficiencies in Chief Farrell's actions.  More is required to maintain a claim of ratification.  Accordingly, the Court GRANTS summary judgment for Chief Farrell on this issue.

### III. Whether the Search and Seizure Were Reasonable

The Fourth Amendment protects against unreasonable searches and seizures.  The Officer Defendants contend that any search or seizure was reasonable under the Fourth Amendment because it was necessary to alleviate the risk of serious injury or death.  Mot. at 11-14 (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006)).  Kam responds that the exception articulated by the Officer Defendants is too broad because it would allow the officers to seize virtually every one of the hundreds of boats present on the day of the encounter.  Opp. at 9-12.  Kam further

argues that the Officer Defendants should have taken a less intrusive alternative.  Opp. at 9-12.

### a. The Warrant Requirement and the Emergency Aid Exception

To pass constitutional muster, searches and seizures under the Fourth Amendment typically require a warrant. See <u>Brigham City</u>, 547 U.S. at 403.  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."  <u>Id.</u> (citations omitted).  The "emergency aid" exception "obviate[es] the requirement of a warrant" when police "need to assist persons who are seriously injured or threatened with such injury."  <u>Brigham City</u>, 547 U.S. at 403.  This is the exception that the Officer Defendants invoke to justify the warrantless search and seizure alleged here.

The emergency aid exception is applicable if a two-prong test is met.  The first prong asks whether "considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm."  <u>United States v. Snipe</u>, 515 F.3d 947, 952 (9th Cir. 2008); <u>see also</u> <u>Brigham City</u>, 547 U.S. at 404.  "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests, because

the emergency exception is narrow and rigorously guarded."
Bonivert v. City of Clarkston, 883 F.3d 865, 877 (9th Cir. 2018)
(internal citations and quotation marks omitted).

The second prong asks whether the "scope and manner"
of the police conduct "were reasonable to meet the need."
Snipe, 515 F.3d at 952. "Even if a warrant is not required, a
search is not beyond Fourth Amendment scrutiny; for it must be
reasonable in its scope and manner of execution. Urgent
government interests are not a license for indiscriminate police
behavior." Maryland v. King, 569 U.S. 435, 448, 133 S. Ct.
1958, 1970, 186 L. Ed. 2d 1 (2013); see also Brigham City, 547
U.S. at 406 (considering the reasonableness of the manner of the
officers' entry).

"In a § 1983 case, the question whether exigent
circumstances existed is generally one for the jury." Lyall v.
City of Los Angeles, 807 F.3d 1178, 1189 (9th Cir. 2015).

### b. Fourth Amendment's Application to Vessels

Vessels in open water present some unique Fourth
Amendment concerns distinct from, for example, homes or
automobiles.

In United States v. Villamonte-Marquez, the Supreme
Court held that customs officers who stopped and boarded a
vessel to ensure compliance with documentation requirements did
not violate the Fourth Amendment even though the officers were

acting without any articulable suspicion. 462 U.S. 579, 593,
103 S. Ct. 2573, 2582, 77 L. Ed. 2d 22 (1983). The Court
acknowledged that the same type of stop performed on an
automobile would have violated the Fourth Amendment, but "[t]he
nature of waterborne commerce in waters providing ready access
to the open sea is sufficiently different from the nature of
vehicular traffic on highways" to justify the intrusion. Id. at
593; see also id. at 588.

The Court's analysis focused on the reasonableness of
the government's conduct by balancing the intrusion on the
individual's Fourth Amendment interests against the legitimate
governmental interests. Id. at 588. "While the need to make
document checks is great," the intrusion on Fourth Amendment
interests was limited because the document check involved only a
brief detention while the officers boarded public areas of the
vessel and did not involve a search of the occupants or vessel.
Id. at 592.

Applying Villamonte-Marquez, the Ninth Circuit has
held that "a daytime boarding for the purpose of conducting a
safety inspection that is conducted in a minimally intrusive
manner, when the vessel is in a location that poses a
substantial risk to its occupants, is reasonable under the
Fourth Amendment balancing test." United States v. Humphrey,

759 F.2d 743, 747 (9th Cir. 1985).[7/]  Like in <u>Villamonte-Marquez</u>,

the privacy invasion in <u>Humphrey</u> was limited because the

officers were on a publicly exposed deck.  And, in addition to

the governmental interest in enforcing documentation laws, there

was a second governmental interest:  safety.  The officer had

boarded the vessel to determine whether it was able to make the

journey home and testified that "he would have been remiss in

his duty to insure the safety of United States citizens at sea

if he had not made a safety inspection . . . under the

circumstances."  <u>Humphrey</u>, 759 F.2d at 747.  "More generally, an

unsafe vessel is not only a hazard to its occupants, but can

pose dangers to international commerce by sea."  <u>Id.</u>

　　Neither case stated that it relied on the emergency

aid exception, instead balancing the relevant interests in order

to determine reasonableness.  <u>Villamonte-Marquez</u>, 462 U.S. at

588; <u>Humphrey</u>, 759 F.2d at 746.  And both cases focused on

whether the initial boarding by the officers was justified under

the Fourth Amendment rather than examining any subsequent

seizure.[8/]  Once aboard, the officers observed evidence of drug

---

[7/] The court noted that its conclusion was "highly fact specific" and did not "establish a general rule that approves all warrantless, suspicionless, and discretionary boardings of noncommercial vessels on the high seas."  <u>Humphrey</u>, 759 F.2d at 747.

[8/] Both the Supreme Court and Ninth Circuit reserved the question of whether a routine safety and document inspection would justify intruding on the privacy of the below-deck living quarters absent independent cause. <u>Villamonte-Marquez</u>, 462 U.S. at 584 n.3; <u>Humphrey</u>, 759 F.2d at 749.  In (Continued . . .)

violations justifying the subsequent seizure.  Villamonte-Marquez, 462 U.S. at 583; Humphrey, 759 F.2d at 745.

### c. Analysis

The critical question in this case is whether the search and seizure of the Wind Warrior were reasonable.  Because there are genuine issues of material fact surrounding the search and seizure of the Wind Warrior, the Court denies summary judgment on this issue.

### i. Totality of Circumstances

Under the two-prong test for the emergency aid exception, the Court first looks to whether the totality of the circumstances created an objectively reasonable basis for the Officer Defendants to conclude that there was an immediate need to protect others.

The Officer Defendants submit evidence of a chaotic scene involving an overloaded boat with at least one person apparently unconscious and another injuring himself jumping off.[9/]  It is undisputed that Kam was the only asserted captain present and was inebriated so that he could not drive the boat

---

Humphrey, independent cause was present because the officers were informed by the passengers that weapons were present below deck.  Humphrey, 759 F.2d at 748.

[9/] In fact, Kam submits an interview with Officer Farrell regarding the incident in which Officer Farrell states that he saw several people unconscious, that Kam was unconscious for at least part of the interaction, and that the individual jumping off the boat needed medical attention.  Pl's. Ex. D.  The Officer Defendants do not address this evidence in their briefing.

The Officer Defendants cite additional concerns (1) regarding potential dehydration and hypothermia, as it was approaching 6 P.M., getting dark, and the passengers had little clothing; (2) that the vessel was located a quarter mile or more away from shore, and the ability of intoxicated persons to swim back to shore if necessary was compromised; (3) there were dangerous prevailing weather conditions; and (4) there was insufficient lighting for the boat to stay anchored overnight (and there is no evidence that the Officer Defendants were aware of or informed that Kam intended to spend the night aboard the vessel or knew of any plans for the 15-20 passengers).

But Kam asserts that the vessel was ready and able to stay anchored in place overnight, as he and his friends had done in years past. This contradicts the Officer Defendants' testimony regarding the requisite lighting. While the Officer Defendants contest the sufficiency of the Wind Warrior's anchor, Kam submits that the Wind Warrior had been anchored in place for several hours already. Kam does not address the plans for the remaining passengers to get back to shore.

The Officer Defendants' remaining concerns are arguably contradicted by the testimony Kam presents from two other officers, both of whom suggest that the reasons for seizing the Wind Warrior were at best not clear and at worst non-existent. According to Officer Colt, he later "expressed

concern" to his branch chief "that as far as I knew we hadn't established probable cause or cause for seizing that vessel." Pl's. Ex. B at 23:11-14, 23:25-24:3.

According to Officer Silberstein, Officer Helm indicated multiple possible reasons to justify why the Wind Warrior had been seized, including hazard to navigation, underaged drinking, and possibly illegal charter, but on the day of the seizure "[i]t wasn't clear specifically where we -- whether we were investigating all of those things or any one of those things." Pl's. Ex. C at 15:14-16:4. Officer Silberstein then references a conference call he listened in on between Officer Colt and Chief Farrell, in which the officers discussed the reason the vessel was taken:

> Hazard to navigation, you know, it was discussed like was it a hazard to navigation probably not under maritime law was the kind of discussion that was going on. The prohibitions case was a concern because again, nobody seemed to observe any of the underage people in possession or consumption of alcohol. So there was that discussion to try and okay what -- what was, you know, -- and, I didn't know what, you know, I wasn't aware of why the vessel was taken specifically.

Pl's. Ex. C 26:6-16.

The Court concludes there are disputed issues of material fact concerning whether there was an objectively reasonable basis for the Officer Defendants' actions.

## ii. Manner and Scope

The Court second considers whether the manner and scope of the seizure were reasonable.

According to the Officer Defendants' version of the facts, Officer Helm and other officers boarded the vessel because they were responding to a report of fighting aboard the Wind Warrior. Chief Farrell's interview indicates a man hit his head falling off the vessel and he observed three or four unconscious people on board who required medical care. There were 15-20 passengers on board who needed to get back to shore, shore was approximately a half mile away, and it was getting dark. The only so-called captain on board was admittedly inebriated and unable to handle the vessel, so the officers needed to take control of the vessel and take it into harbor.

On the other hand, Kam's version of the facts is that the fight the officers were responding to had ended some fifteen minutes prior to their arrival, and by the time the officers arrived, the people aboard the vessel were peacefully sitting and listening to music. The officers—without a warrant or probable cause—boarded the Wind Warrior and Officer Helm began shouting that everybody aboard was under arrest. Kam and his friends that were capable of piloting the Wind Warrior had planned to spend the night aboard the vessel if Kam and the others were not sufficiently sober to return the vessel to port

after they watched the evening fireworks.  There was nobody on board who required medical care.  Some DOCARE officers later expressed questions about the probable cause for the seizure of the vessel and Officer Helm's handling of Kam.[10/]

Kam asserts that the manner and scope of the seizure of the vessel were improper for the following reasons.  Kam contends that Officer Helm boarded the vessel without a warrant, probable cause, or permission, and that when Officer Helm boarded, he declared everyone on board was under arrest. Further, Officer Helm required Kam to lie prone on the deck and stepped on his back or neck.  Additionally, Kam asserts that the vessel was improperly searched and cabinets were damaged. Finally, Kam asserts that cutting the anchor line was improper.

On the other hand, the Officer Defendants assert that everything they did was lawful and appropriate, and that they initially boarded the vessel in responding to a fight that they were notified was occurring on board the vessel.  The Officer Defendants further reiterate all of the grounds that they asserted in conjunction with the questions regarding the

---

[10/] Kam submits the deposition testimony of Officers Colt and Silberstein to support this contention. Pl's. Ex. B at 23:11-14, 23:25-24:3 (Officer Colt later "expressed concern" to his branch chief "that as far as I knew we hadn't established probable cause or cause for seizing that vessel."); Pl's. Ex. C 26:6-16 (Officer Silberstein stated there was a later conference call on which it was discussed that the Wind Warrior was probably not a hazard to navigation under maritime law, that nobody observed any underage people possessing or consuming alcohol undermining any prohibitions case, and that he "wasn't aware of why the vessel was taken specifically.").

reasonableness of seizing the vessel and making the search for life jackets, and the need to pilot the vessel back to the harbor.

The Court concludes with regard to the second prong of the test that there are material issues of fact as to whether the scope and manner of the Officer Defendants' conduct were reasonable to meet the need. <u>See</u> <u>Snipe</u>, 515 F.3d at 952.

### d. Conclusion

As referenced in <u>Humphrey</u>, an unsafe vessel is not only a danger to its occupants but to all those who might encounter it. 759 F.2d at 747. That concern is elevated in an environment crowded with intoxicated individuals on all manner of flotation device and with other vessels nearby. <u>See</u> Mot. at 12 ("There were hundreds of other vessels and over a thousand individuals on personal floatation devices many of those being cheap pool floaties" and "Officer Helm could not allow Plaintiff, an unidentified, unlicensed, highly intoxicated, yet self-proclaimed 'captain' to operate a double hulled catamaran that was over forty feet in length in under such conditions.").[11/]

However, Kam asserts that the Officer Defendants boarded the vessel without a warrant, probable cause, or

---

[11/] In their argument on false arrest and false imprisonment, the Officer
(Continued . . .)

permission.  He further asserts that despite Officer Helm's

declaration upon arrival that all present were under arrest,

there was no evidence of any crime and Kam was nevertheless made

to lie face down on the deck of the Wind Warrior for about an

hour while the officers seized the vessel, assumed control of

it, and conducted a warrantless search.  On the other hand, the

Officer Defendants assert that they boarded the vessel in

response to a fight on board and were confronted with a chaotic

scene involving numerous intoxicated individuals on board a

vessel as it was getting dark without a safe way back to shore,

some of whom were in need of medical attention.  According to

the Officer Defendants, this created an exigency justifying the

search for life jackets and seizure of the boat and its

passengers.

     In summary, because there are disputed issues of

material fact regarding whether the search and seizure of the

vessel was reasonable, the Court denies summary judgment on this

claim.

---

Defendants cite to a Hawaii statute giving marine law enforcement officers
discretion to terminate a voyage when the officer observes unsafe conditions
creating hazardous conditions.  Mot. at 16, citing HAR § 13-242-16.  There is
at least some factual issue over whether these conditions were unsafe, based
on other officers that were present suggesting a possible lack of probable
cause for seizing the boat.

## IV.  Qualified Immunity

Even if the Officer Defendants violated Kam's Fourth Amendment rights, they are still entitled to dismissal of the lawsuit based on qualified immunity if "clearly established law does not show that the search [and seizure] violated the Fourth Amendment." Pearson v. Callahan, 555 U.S. 223, 243–44, 129 S. Ct. 808, 822, 172 L. Ed. 2d 565 (2009).  "[T]he 'clearly established' inquiry is a question of law that only a judge can decide." Morales v. Fry, 873 F.3d 817, 821 (9th Cir. 2017). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 555 U.S. at 244 (quoting Wilson v. Layne, 526 U.S. 603, 614, 119 S. Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999)).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)).

In this case, the appropriate inquiry asks objectively whether a reasonable officer could have believed that seizing the Wind Warrior, performing a search for life jackets, cutting the anchor line, piloting the Wind Warrior back to shore, and requiring Kam to lie face down on the deck for the duration of

the encounter was lawful, in light of clearly established law and the information that the officers possessed.  See Wilson, 526 U.S. at 615.  The resolution of that question depends on the resolution of disputed facts.

On the one hand, from the Officer Defendants' standpoint, they boarded the vessel in responding to a report of a fight; had concerns the vessel was overloaded; arrived on scene to find the self-asserted captain to be intoxicated; knew that it was getting dark and the vessel was some distance from shore, where other vessels and people on flotation devices were around the Wind Warrior; saw 15-20 passengers that they believed needed to get back to shore; saw someone (or several people) unconscious on the deck of the boat; and saw someone injure himself jumping off of the boat and believed he required medical attention.

On the other hand, Kam's position contends that the only basis for the Officer Defendants' presence on the Wind Warrior was a fight that had ended fifteen minutes prior to their arrival.[12/]  The vessel was safely anchored in place and could safely remain anchored in place overnight.  The Wind Warrior had an appropriate number of passengers, and it should have been apparent to the Officer Defendants that those

---

[12/] The Court notes that Officer Colt undermines this position by his statement that upon boarding, Officer Helm "was trying to figure out you know where the affray was that was still going on . . ."  Pl's. Ex. B at 13:9-16.

passengers either were themselves prepared to spend the night on the vessel or had alternate plans of safely getting back to shore.  Kam would contend that one individual was merely sleeping on the vessel when the Officer Defendants arrived, and the individual alleged to have hit himself while jumping off was not injured and did not require medical attention.  The winds were not as severe or dangerous as the Officer Defendants allege and nobody present was in any immediate danger.  Officer Helm was immediately aggressive when he arrived on the scene and he used excessive force against Kam without provocation.

To wit, there are many disputed issues of material fact that a factfinder will have to determine. Kam's version of the Officer Defendants' search, seizure, and other alleged improper conduct would violate Kam's established rights.  On the other hand, the version of the Officer Defendants shows that the reasonable officer would believe that the search and seizure of the vessel was lawful.

"[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity.  The issue can then be raised in a [Federal Rule of Civil Procedure] Rule 50(a) motion at the close of evidence." Morales v. Fry, 873 F.3d 817, 824 (9th Cir. 2017) (quoting Ninth Circuit Model Civil Jury Instruction 9.34 (2017)

(second alteration in original).  The Court therefore defers

ruling on the issue of qualified immunity until the disputed

factual issues are determined by the jury.

### V.    False Arrest or Imprisonment

False arrest and imprisonment are "distinguishable

only in terminology" and for both, "the essential elements are

(1) the detention or restraint of one against his [or her] will,

and (2) the unlawfulness of such detention or restraint."  Reed

v. City & Cty. of Honolulu, 76 Haw. 219, 230, 873 P.2d 98, 109

(1994) (internal quotation marks and citation omitted)

(alteration in original).  The existence of probable cause is a

defense to the claims.  Id.  Because the Officer Defendants are

non-judicial governmental officials, they have qualified or

conditional immunity for tortious acts under state law claims,

requiring a showing that the officers were motived by malice and

not by an otherwise proper purpose.  Towse v. State, 64 Haw.

624, 632, 647 P.2d 696, 702 (1982); see also Dawkins v. City &

Cty. of Honolulu, No. 10-00086 HG-KSC, 2010 WL 3489580, at *2

(D. Haw. Aug. 31, 2010) (applying the requirement to a claim of

false arrest and imprisonment).

On the first element, the parties dispute whether

Officer Helm stated that Kam was under arrest and forced Kam to

lie in the prone position on the deck for an hour while Officer

Helm piloted the Wind Warrior back to shore.  The parties also

dispute whether Officer Helm put his foot on Kam's neck and back and threatened to smash Kam's head in if he didn't shut up.  If this occurred without probable cause, it would constitute a detention or restraint of Kam against his will.  It would also raise the issue of malice as required to overcome Officer Helm's conditional immunity.  Kam provides no evidence that Chief Farrell was involved in these actions.

On the second element, the Court has already found a genuine issue of material fact regarding whether the search and seizure of the vessel was in violation of the Fourth Amendment. Officer Helm asserts that he did not require Kam to lie prone on the deck and therefore did not restrain him.  The Court notes that while Kam claims he was restrained against his will by being required to lie prone on the deck, he does not assert that he was restrained against his will by remaining aboard the vessel.

The Court concludes there are material issues of fact regarding Kam's claim as against Officer Helm.  Officer Helm is the one who is alleged to have boarded the Wind Warrior, announced all passengers were under arrest, ordered Kam to lay prone on the deck, and allegedly put his foot on Kam's back or neck.  Officer Helm denies these allegations.

The only evidence submitted that Chief Farrell may have even been aware of these actions is (1) Kam's declaration

regarding the ongoing communication between Officer Helm and Chief Farrell; and (2) Chief Farrell's interview where he states that he had a clear view of Officer Helm and did not see him doing anything wrong, and saw Kam was passed out on the deck in a fetal position in front of the steering station, Pl's. Ex. D. Because Kam has not submitted evidence that Chief Farrell was involved in the assertion of arrest or demand for Kam to lie prone on the deck, or provided any indication of malice on Chief Farrell's part, the Court GRANTS summary judgment on the claim of false arrest or imprisonment as against Chief Farrell.[13]

## VI. Chief Farrell's Liability for Assault or Battery

"A person commits the common law tort of assault if he or she acts with intent to cause another a nonconsensual harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact." Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001) (citations omitted). "A person commits the common law tort of battery if he or she acts with intent to cause a nonconsensual harmful or offensive contact, or apprehension thereof, and the contact occurs." Id.

---

[13] Nor can Chief Farrell be held individually liable for the torts of Officer Helm merely because Chief Farrell is his supervisor. Kam cannot rely on respondeat superior liability because Chief Farrell is not Officer Helm's employer. Wong-Leong v. Hawaiian Indep. Refinery, Inc., 76 Haw. 433, 438, 879 P.2d 538, 543 (1994) ("Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment." (emphasis added) (citations omitted)); see also Tokuhama v. City & Cty. of Honolulu, 751 F. Supp. 1385, 1394 (D. Haw. 1989) (permitting a claim of respondeat superior liability against the City and County of Honolulu for false arrest).

As with other state law tort claims, a nonjudicial officer is protected by a conditional immunity and is only liable where a plaintiff proves malice by clear and convincing evidence.  Kimes v. Matayoshi, No. CV 16-00264 JMS-RLP, 2017 WL 4638220, at *7 (D. Haw. Oct. 16, 2017), aff'd, 782 F. App'x 622 (9th Cir. 2019) (stating the malice requirement to overcome conditional immunity in relation to a claim of assault and battery).

### a. Chief Farrell's Direct Liability

First, Kam has not offered any evidence that Chief Farrell acted with malice.  For this reason alone Chief Farrell is entitled to conditional immunity.  Regardless, the evidence does not show that Chief Farrell directed Officer Helm to commit the alleged assault and battery.

Chief Farrell has provided evidence that he was never on the Wind Warrior and never in a position to touch Kam.  See Farrell Decl.; see also Pl's. Ex. D, DOCARE Internal Affairs Investigation Interview.  Kam has not offered any evidence otherwise (and in fact Kam submits Chief Farrell's interview in which he states that he did not see Officer Helm make any threatening gestures towards Kam, Pl's. Ex. D).  Instead, Kam argues that "Chief Farrell instigated and ordered Plaintiff's unlawful, unreasonably lengthy, and unnecessarily forceful detention, and gave direct orders to Defendant Helm that resulted in Plaintiff[']s detention, assault, and battery; thus,

- 39 -

Chief Farrell is liable for the assault and battery of Plaintiff." Opp. at 13.

Kam cites to Johnson v. Sartain, 46 Haw. 112, 114, 375 P.2d 229, 230 (1962) for the liability of a person who directs an assault or battery. Johnson is clearly distinguishable. In that case, there was evidence that the person who directed the assault told another "You see that black son-of-a-bitch? He think he's smart. Go over and lay a Sunday punch on him," while nodding at the plaintiff. Id.; cf. McCormack v. City & Cty. of Honolulu, 762 F. Supp. 2d 1246, 1252 (D. Haw. 2011) (finding insufficient allegations to maintain an assault and battery claim against the city where the plaintiff had alleged the city "rubber stamp[ed]" the officer's use of force).

Kam offers evidence that Chief Farrell directed officers, including Helm, to board the Wind Warrior and return it to the harbor. Kam has provided no evidence that Chief Farrell directed Officer Helm to assault or batter him, or that Chief Farrell knew an assault or battery was occurring. Applying Johnson to these facts, Chief Farrell cannot be held personally liable for Officer Helm's alleged assault and battery.

### b. Vicarious Liability

Nor can Chief Farrell be held liable here on a theory of vicarious liability. While "[a] principal may be liable for

the wrongful acts of its agent that occur while [the agent is] acting within the scope of the agency," <u>Lopeti v. Alliance Bancorp</u>, No. 11-00200 ACK-RLP, 2011 WL 13233545, at *15 (D. Haw. Nov. 4, 2011), "[v]icarious liability under the respondeat superior doctrine ordinarily requires some kind of employment relationship or other consensual arrangement under which one person <u>agrees to act under another's control</u>," <u>State v. Hoshijo ex rel. White</u>, 102 Haw. 307, 319, 76 P.3d 550, 562 (2003) (quoting Dan B. Dobbs, <u>The Law of Torts</u>, § 335, at 910 (2000)) (emphasis in <u>Hoshijo</u>).  Here, Officer Helm's relevant employment relationship is with DOCARE, not with Chief Farrell.  DOCARE is no longer a defendant in this case and vicarious liability does not apply.  <u>Cf.</u> <u>Hoshijo</u>, 102 Haw. at 319 (where a student coach was supervised by a university employee, the student coach was subject to the control of the university and the university could be held vicariously liable for his conduct).

Because there is no genuine dispute of these facts and no rationale factfinder could find Chief Farrell liable for Kam's alleged assault and battery, the Court GRANTS summary judgment to Chief Farrell on claims for assault and battery.

### VII. Plaintiff's Emotional Distress

A plaintiff asserting a claim for intentional infliction of emotional distress must establish "1) that the act allegedly causing the harm was intentional or reckless, 2) that

the act was outrageous, and 3) that the act caused 4) extreme emotional distress" to him.  Hac v. Univ. of Hawai'i, 102 Haw. 92, 106–07, 73 P.3d 46, 60–61 (2003).  As with other state law tort claims, a nonjudicial officer is only liable where a plaintiff proves malice by clear and convincing evidence.  See Kimes v. Matayoshi, No. CV 16-00264 JMS-RLP, 2017 WL 4638220, at *7 (D. Haw. Oct. 16, 2017), aff'd, 782 F. App'x 622 (9th Cir. 2019) (stating the malice requirement to overcome conditional immunity in relation to a claim of negligent infliction of emotional distress).

        "The term 'outrageous' has been construed to mean 'without just cause or excuse and beyond all bounds of decency.'"  Enoka v. AIG Hawaii Ins. Co., 128 P.3d 850, 872 (Haw. 2006) (quoting Lee v. Aiu, 936 P.2d 655, 670 n. 12 (Haw. 1997)).  "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable people may differ on that question it should be left to the jury."  Young v. Allstate Ins. Co., 119 Haw. 403, 429, 198 P.3d 666, 692 (2008) (internal quotation marks and citation omitted).

        "'[E]xtreme emotional distress' constitutes, among other things, mental suffering, mental anguish, nervous shock, and other 'highly unpleasant mental reactions.'"  Young, 119 Haw. at 429 n.26 (quoting Enoka v. AIG Hawai'i Ins. Co.,

Inc., 109 Hawaiʻi 537, 559, 128 P.3d 850, 872 (2006)).

"[M]ental distress may be found where a reasonable [person],

normally constituted, would be unable to adequately cope with

the mental stress engendered by the circumstances of the case."

Id. (quoting Shoppe v. Gucci Am., Inc., 94 Hawaiʻi 368, 387, 14

P.3d 1049, 1068 (2000)) (alterations in original).

Kam has not shown extreme emotional distress. When

asked about any emotional or mental injuries he suffered as a

result of the events on the Wind Warrior, Kam asserted that he

suffered "[a] little bit." Defs'. Ex. A at 144:23-145:4. This

statement summarizes his description of the emotional harm he

suffered. It also summarizes why his claim for extreme

emotional distress fails.

Kam has admitted that he suffered no physical injury

from the events on the Wind Warrior; that he sought no medical

treatment; that he feels the incident was traumatic because it

gave him concerns about being hassled in the future by DOCARE

officers but he tries not to "stress out on it"; that he had one

future incident with a DOCARE officer who caused Kam no injury;

and that he had no other mental injuries resulting from the

incident. Defs'. Ex. A at 144:6-147:3. Indeed, during his

deposition, Kam was directly asked if he suffered mental or

emotional injuries, and his response was: "Yeah, you could say

that. A little bit." Defs'. Ex. A at 144:23-145:1. He then

went on to refer to the incident as "traumatic," and when asked
what he meant, Kam explained that he continued to think about
the incident and whether he is more likely to have ongoing
negative interactions with DOCARE officers.  Defs'. Ex. A at
145:1146:3.  But in the only future incident with a DOCARE
officer, Kam indicated that he had no stress as he felt that the
officer was only doing his job.  Defs'. Ex. A at 145:20-146:24.

Aside from declaring that he suffers distress, he has
not supported his claim with any evidence thereof.  Kam has
apparently coped well with any mental stress engendered by the
encounter.  These facts do not support a claim of extreme
emotional distress.

Kam's declaration asserts stronger verbiage to
describe the emotional injury caused by the events on the Wind
Warrior.  "The general rule in the Ninth Circuit is that a party
cannot create an issue of fact by an affidavit contradicting his
prior deposition testimony."  Kennedy v. Allied Mut. Ins. Co.,
952 F.2d 262, 266 (9th Cir. 1991) (citations omitted).  "[I]f a
party who has been examined at length on deposition could raise
an issue of fact simply by submitting an affidavit contradicting
his own prior testimony, this would greatly diminish the utility
of summary judgment as a procedure for screening out sham issues
of fact."  Id.  The sham affidavit rule does not preclude a
party from elaborating on or clarifying the prior testimony, or

from correcting an honest mistake.  Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009).

The Court finds Kam's deposition testimony to be candid and clear.  To the extent that his subsequent declaration introduces contradictory testimony magnifying and expanding his alleged emotional injury, the Court finds it to be a sham. Kennedy, 952 F.2d at 267 (Before refusing to give credence to a contradictory affidavit, "the district court must make a factual determination that the contradiction was actually a 'sham.'"). Even considering the declaration at face value, the stress and heightened anxiety described therein still do not rise to the high standard required for "extreme emotional distress."

That Kam suffered "[a] little bit" of emotional injury is unfortunate, but not compensable under the law for intentional infliction of emotional distress.  The Court GRANTS the Officer Defendants' motion for summary judgment on this claim.

## VIII.    Violations of the Hawaii State Constitution

The Officer Defendants assert that Count VII for invasion of privacy must be dismissed, which Kam concedes.  Mot. at 18-19; Opp. at 14 n.1 ("Plaintiff concedes that Count VII of the Complaint for Invasion of Privacy be dismissed."). Accordingly, the Court GRANTS summary judgment in favor of the Officer Defendants on Count VII.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Partial Summary Judgment, ECF No. 52. The Court GRANTS summary judgment and DISMISSES the following claims:

(1) excessive force in violation of the Fourth Amendment against Chief Farrell;

(2) assault against Chief Farrell;

(3) battery against Chief Farrell;

(4) false arrest and false imprisonment against Chief Farrell;

(5) invasion of privacy against both Chief Farrell and Officer Helm; and

(6) intentional infliction of emotional distress against both Chief Farrell and Officer Helm.

The Court finds genuine issues of material fact, and therefore DENIES summary judgment, on the following claims:

(1) unreasonable search and seizure in violation of the Fourth Amendment as against both Chief Farrell and Officer Helm; and

(2) false arrest and false imprisonment against Officer Helm.

The Motion did not address, and the Court therefore does not rule on, the following claims:

(1) excessive force in violation of the Fourth

Amendment as against Officer Helm;

(2) assault against Officer Helm;

(3) battery against Officer Helm; and

(4) negligence against both Chief Farrell and Officer

Helm.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, March 27, 2020.

_____
Alan C. Kay
Sr. United States District Judge

<u>Kam v. Helm, et al.</u>, Civ. No. 19-00052 ACK-KJM, Order Granting in Part and Denying in Part the Officer Defendants' Motion for Partial Summary Judgment.